**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | | |
|---|---|---|
| **FOAM MASTER, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **NO. 5:24-CV-00389-CHB-MAS** |
| **PARATUS SUPPLY, INC.,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Foam Master, LLC ("Foam Master") has moved the Court to reform and enforce the June 2026 settlement agreement it reached with Defendant Paratus Supply, Inc. ("Paratus Supply"). [DE 24]. Foam Master asks the Court to (1) reform the written agreement to add an obligation for Paratus Supply to provide and install new hoses on the spray foam rig at issue, on the ground that the omission resulted from mutual mistake; (2) enforce the agreement as reformed by requiring Paratus Supply to pick up the rig, install a new generator and new hoses, perform startup, submit the warranty forms necessary to establish a valid one-year factory warranty, provide the startup video, and return the rig; and (3) require Paratus Supply to prove that the installed generator is new, including proof of purchase from Winco, and to provide documentation sufficient to establish that the promised warranty will remain

valid for one year. [DE 24, Page ID# 208–09]. Foam Master alternatively requests an evidentiary hearing. [DE 24, Page ID# 209].

Paratus Supply opposes the motion, arguing that the written agreement contains no hose obligation, that Foam Master cannot meet the standard for reformation, and that Paratus Supply has fully performed. [DE 30]. In its response, Paratus Supply also asks the Court to enforce the agreement as written by directing Foam Master to file, within seven days, the agreed order of dismissal with prejudice required by the second paragraph numbered 8 of the agreement. [DE 30, Page ID# 263].

After careful consideration and as explained below, the Court rules that Foam Master's motion is denied.

## I. <u>RELEVANT FACTUAL BACKGROUND</u>

Foam Master purchased a spray foam rig (the "Rig") from Paratus Supply in June 2023. [DE 30-1, Page ID# 267; DE 1]. Foam Master later sued Paratus Supply alleging, among other things, that the Rig was not fit for a particular purpose. [DE 30-1, Page ID# 267].

During the pendency of the case, the parties negotiated a settlement through counsel. Specifically, in response to a prior demand from Foam Master, Paratus Supply sent an email on February 8, 2026, providing two settlement "options." Option 1 provided that Paratus Supply would "install a brand new 30kW generator and supply Foam with new hoses" and provide "a receipt for the new generator and new hoses." [DE 24-1, Page ID# 220]. Option 2 simply offered $65,000 for the rig

"with all of the components that were in it when Foam [Master] purchased it." [DE 24-1, Page ID# 220].

Foam Master first responded that it would "explore option 2," the cash option. [DE 24-1, Page ID# 219]. On April 29, Paratus Supply described Option 1 as removing the current generator, installing the new one, and removing and replacing the "old hoses." [DE 24-1, Page ID# 217]. Foam Master said it was "interested in this option" with added terms: pickup, repair and delivery of the Rig, and a guarantee that it works. [DE 24-1, Page ID# 216]. Paratus Supply declined the guarantee and agreed to "install a 30kW generator." [DE 24-1, Page ID# 215].

After further exchanges, Paratus Supply's May 6 email stated that Foam Master's terms were "acceptable with the following conditions," and Foam Master agreed on May 11. [DE 24-1, Page ID# 212–14]. Those conditions refer to a "generator" and do not mention hoses. [DE 24-1, Page ID# 212–13]. In the emails in the record, hoses are last mentioned in the April 29, 10:10 a.m. email.

The parties then signed a written Settlement Agreement in June 2026. Paratus Supply was to pick up the Rig, "make necessary repairs," and return it. It was also to "install a new 30kW diesel generator," make a video of it running, and provide a "1-year manufacturer's warranty for which Defendant shall not be responsible for any requirements and/or conditions precedent." [DE 30-1, Page ID# 267 (¶¶ 3–4)]. Foam Master was to file an agreed order of dismissal with prejudice within seven days after the Rig's return. [DE 30-1, Page ID# 268]. The Agreement

does not mention hoses or a receipt for the generator. The drafts and redlines exchanged before signing are not in the record. [*See* DE 24-1, Page ID# 211].

Paratus Supply picked up the Rig on June 22 and returned it on July 7. [DE 24, Page ID# 202; DE 30, Page ID# 244]. Paratus Supply states that it installed a new Winco generator. [DE 30, Page ID# 250; DE 30-2, Page ID# 273]. The hoses were not replaced. [DE 24, Page ID# 202]. Foam Master declined to dismiss citing the missing hoses, the absence of proof that the generator was new, and a concern that the warranty may be invalid or shortened because the unit shipped to Paratus Supply on July 30, 2025, and was not started until July 6, 2026. [DE 24-2, Page ID# 222, 225; DE 24-3, Page ID# 226; DE 24-4, Page ID# 231]. Paratus Supply responded with a July 27 letter from a Winco service manager verifying the unit as new and the warranty as running from July 6, 2026. [DE 30-2, Page ID# 273]. No dismissal has been filed.

## II. <u>ANALYSIS</u>

### A. <u>LEGAL STANDARD</u>

The Settlement Agreement states that Kentucky law applies, something the parties do not dispute. [DE 30-1, Page ID# 269].

Under Kentucky law, "[s]ettlement agreements are a type of contract; therefore, their interpretation is a question of law." *Adamson v. Adamson*, 635 S.W.3d 72, 77 (Ky. 2021). The elements of a valid contract are "an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration." *Univ. of Ky. v. Regard*, 670 S.W.3d 903, 912 (Ky. 2023). Acceptance must match the offer. "An acceptance must be unequivocal in order to create a

contract," and "an acceptance must comply exactly with the requirements of the offer, omitting nothing from the promise or the performance requested." *Venters v. Stewart*, 261 S.W.2d 444, 446 (Ky. 1953). Once the parties have reduced their agreement to an unambiguous writing, "a written instrument will be enforced strictly according to its terms." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). In that circumstance, the Court looks "only as far as the four corners of the document" to determine the parties' intentions. *Id.* at 695 (citing *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005)).

A district court has "broad, inherent authority and equitable power . . . to enforce an agreement in settlement." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 419 (6th Cir. 2000); *see also Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976); *Kukla v. Nat'l Distillers Prods. Co.*, 483 F.2d 619, 621 (6th Cir. 1973). That authority is not unlimited. "Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645–46 (6th Cir. 2001) (citing *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988)).

## B. WHETHER THE PARTIES' AGREEMENT INCLUDED NEW HOSES

Per this standard, the Court begins with the four corners of the Settlement Agreement itself. In short, the Settlement Agreement does not mention hoses.

The contract describes the work three times, and each time in terms of the generator alone:

- Foam Master was to remove personal items not necessary for "the removal of the originally installed generator and installation of the new generator." [DE 30-1, Page ID# 267 (¶ 2)].
- Paratus Supply was to "install a new 30kW diesel generator" and make a video showing that it runs. [DE 30-1, Page ID# 267 (¶ 4)].
- Paratus Supply would "keep the originally installed diesel generator." [DE 30-1, Page ID# 267 (¶ 5)].

The Agreement also provides that it is "the entire, full, and complete agreement concerning the subject matter hereof," and that no "variance from" it binds either party unless made in a writing the parties execute. [DE 30-1, Page ID# 270 (¶ 22)].

Foam Master does not dispute that the Settlement Agreement is silent on hoses. More specifically, it does not contend that any provision of the Settlement Agreement is ambiguous, or that any term, read in context, encompasses hoses.[1] Its position is that the hose term was "mistakenly omitted" from the writing. [DE 24, Page ID# 202; *see also* DE 31, Page ID# 276]. Paratus Supply, for its part, observes that the work is described identically three times, with "no mention of hoses anywhere in the document." [DE 30, Page ID# 256].

Enforced as written, then, the Settlement Agreement imposes no obligation on Paratus Supply to supply or install new hoses. "The fact that one party may have

[1] Paragraph 3 requires Paratus Supply to "make necessary repairs, then deliver the repaired Rig." [DE 30-1, Page ID# 267 (¶ 3)]. Foam Master does not argue that "necessary repairs" is ambiguous or that it includes hose replacement, and the Court does not construct that argument on its behalf.

intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Dunaway*, 490 S.W.3d at 695 (quoting *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2012)). Consequently, Foam Master's request for new hoses stands or falls on its request for reformation, which the Court addresses next.

**1. <u>Reformation</u>**

Kentucky law permits a court to reform a written contract on the equitable ground of mutual mistake, but the party seeking reformation must establish each of three elements:

> First, it must show that the mistake was mutual, not unilateral. Second, "[t]he mutual mistake must be proven beyond a reasonable controversy by clear and convincing evidence." Third, "it must be shown that the parties had actually agreed upon terms different from those expressed in the written instrument."

Abney, 215 S.W.3d at 704 (quoting *Campbellsville Lumber Co. v. Winfrey*, 303 S.W.2d 284, 286 (Ky. 1957)); *see also Adamson v. Adamson*, No. 2022-CA-556-MR, 2024 WL 1335519, at *5 (Ky. Ct. App. March 29, 2024). A mistake is mutual only if it is "one in which both parties participate, each laboring under the same misconception." *Johnson v. Commonwealth Fed. Credit Union*, 834 F. Supp. 3d 748, 758 (E.D. Ky. 2026) (quoting *Karrick v. Wells*, 307 S.W.2d 929, 931 (Ky. 1957)). A scrivener's error in drafting may be corrected on the basis of parol evidence, but the party seeking correction must still prove "that the mistake was mutual and that the parties had actually agreed upon terms different from those expressed in the written instrument." *Id.* at 757-58 (citation omitted).

The burden is heavier still where, as here, the opposing party denies that any mistake occurred. In that circumstance, "the testimony and corroborating evidence of the party seeking reformation must be extremely strong in order to overcome the specific terms of the contract." *Id.* at 758 (quoting *Spratt v. Carroll*, 399 S.W.2d 291, 293 (Ky. 1966)). Where the evidence of mutual mistake is conflicting and the Court "harbors substantial doubt" as to the right to reform, reformation must be denied. *Id.* at 759.

For example, in *Rodarte v. BlueLinx Corp.*, the claimant contended that the omission of one of his injuries from a settlement agreement was a "clerical error" and that the agreement should be read to include it. 677 S.W.3d 469, 473 (Ky. 2023). The Kentucky Supreme Court held that the argument "fails each of these requirements," because the claimant "has never presented any evidence, let alone clear and convincing evidence, of that alleged mutual intent." *Id.* at 478.

Equity also requires diligence of the party seeking relief: reformation "will not be afforded where the complaining party is negligent." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 904 (E.D. Ky. 2014) (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931)).

*a. The Parties' Negotiations*

With this in mind, the Court turns to the negotiations between the parties.[2] Foam Master's case rests on Paratus Supply's own words. Option 1, as first offered

[2] The parties both agree that the Court can review and rely upon settlement communications to prove the existence and terms of the settlement agreement per Federal Rule of Evidence 408.

on February 8, provided that Paratus Supply would "install a brand new 30kW generator and supply Foam with new hoses." [DE 24-1, Page ID# 220]. When Paratus Supply revived Option 1 on April 29, its counsel described the job as follows: "remove the current generator, install the new 30kW generator, remove old hoses, and install new hoses. My client would keep the original generator and hoses that are removed from the rig." [DE 24-1, Page ID# 217]. Foam Master contends that every later reference to "this option" carried that hose term forward, so the term was never withdrawn. [DE 31, Page ID# 275–76].

The record does not bear that reading out with the clarity the law requires. First, the negotiation was not, as Foam Master describes it, "a single, uninterrupted negotiation" over Option 1. [DE 31, Page ID# 275]. In March, Foam Master told Paratus Supply it "would like to explore option 2," the cash alternative. [DE 24-1, Page ID# 219]. Its counsel later called that response "our counteroffer." [DE 24-1, Page ID# 219]. Option 1 returned to the table only when Paratus Supply asked in late April whether Foam Master was "interested in option 1 now." [DE 24-1, Page ID# 218].

Second, the April 29 description was not the last word. That afternoon, Foam Master answered that it was "interested in this option, but has the following additional terms," including a guarantee that the Rig works. [DE 24-1, Page ID# 216]. Paratus Supply refused the guarantee. In the same email it framed its undertaking narrowly: "We will agree to install a 30kW generator because that is what he says he needs. We will provide a receipt for the purchase of the brand new

30kW generator, which comes with a 1-year factory warranty." [DE 24-1, Page ID# 215]. The email does not mention hoses. On May 3, Paratus Supply followed up to ask "if these terms are acceptable." [DE 24-1, Page ID# 214]. Foam Master's May 6 reply, "[m]y client is interested in this option, with the following terms," responded to that generator-only message. [DE 24-1, Page ID# 214]. Foam Master reads "this option" in the May 6 email to mean Option 1 with hoses and inserts "[Option 1]" into its quotation. [DE 31, Page ID# 275]. The more immediate antecedent is the April 29 5:33 p.m. proposal and the May 3 follow-up, neither of which mentions hoses.

Third, Paratus Supply's May 6 conditions, which Foam Master accepted without qualification on May 11, are inconsistent with a hose term. On April 29, Paratus Supply proposed to keep "the original generator and hoses that are removed from the rig." [DE 24-1, Page ID# 217]. On May 6, the corresponding condition read: "Paratus keeps the diesel generator which was originally installed." [DE 24-1, Page ID# 213]. The next condition described the work as "the removal and installation of generator." [DE 24-1, Page ID# 213]. If old hoses were still to be removed and replaced, their disposition would have remained a term, as it was on April 29. Its disappearance from the final offer is consistent with Paratus Supply's position that the job had narrowed to the generator. Foam Master accepted that offer without qualification, writing, "[m]y client is agreeable to these terms." [DE 24-1, Page ID# 212]. Foam Master's reply does not address the change. [*See* DE 31, Page ID# 274-76].

None of this establishes that Paratus Supply affirmatively withdrew the hose term. But Foam Master bears the burden. The most that can be said for Foam Master's position is that the emails are open to two readings: "this option" might have carried the hose term forward, or the hose term might have dropped out when the parties narrowed the job to the generator.[3] Regardless, evidence that leaves the parties' final agreement open to two readings does not prove "beyond a reasonable controversy" that "the parties had actually agreed upon terms different from those expressed in the written instrument." *Abney*, 215 S.W.3d at 704 (citation omitted); *see Johnson*, 834 F. Supp. 3d at 759.

*b. The Post-Signing Correspondence*

Foam Master also points to Paratus Supply's counsel's emails after the dispute arose. It argues that when its counsel raised the missing term, Paratus Supply responded by invoking the Agreement's non-reliance clause rather than denying the agreement. Foam Master says that response concedes "the existence of the side agreement." [DE 31, Page ID# 280]. The Court disagrees.

On July 8, Paratus Supply's counsel quoted ¶ 11(a) of the Settlement Agreement. He did so after writing that Foam Master's counsel "reviewed and edited the settlement agreement and included a number of additional terms," and that Foam Master "also reviewed and signed the settlement agreement." [DE 24-2, Page ID#

[3] Foam Master emphasizes that the hoses cost about $8,000, that the Rig cannot run without them, and that Foam Master paid more than $100,000 for the Rig that has been idle for three years. [DE 24, Page ID# 202, 207; DE 31, Page ID# 278, 282]. None of these facts bears on whether the mistake was mutual.

223]. That is an argument that the signed writing controls, not an admission that it omits an agreed term. On July 14, counsel wrote that "it was your failure and your client's failure to say anything about the hoses in a settlement agreement." [DE 24-2, Page ID# 222].

The July 14 email also asked, "[i]f my client agrees to replace the hoses, what assurances do we have that your client will not continue to avoid his obligations." [DE 24-2, Page ID# 222]. Read in context, that is a question about a possible accommodation, not an acknowledgment that Paratus Supply had already promised new hoses. The correspondence demonstrates that each side blamed the other for the Settlement Agreement's silence on hoses. A mutual mistake is "one in which both parties participate, each laboring under the same misconception." *Johnson*, 834 F. Supp. 3d at 758 (citation omitted). Paratus Supply's counsel consistently attributed any omission to Foam Master. That is evidence, if anything, of a unilateral mistake.

Foam Master had a full opportunity to make sure the Settlement Agreement included a hose term. Foam Master reviewed the proposed Settlement Agreement, made revisions, and then executed the contract. [DE 24-1, Page ID# 211; DE 24, Page ID# 202; DE 30-1, Page ID# 271]. In doing so, Foam Master agreed that it had 'cooperated in . . . the drafting and the preparation of this Agreement,' and represented that it had 'investigated the facts pertaining to the settlement and this Agreement . . . to the full extent it deems necessary." [DE 30-1, Page ID# 269 (¶¶ 11(b), 13)]. Equity asks that the party seeking reformation have exercised reasonable

diligence, *Journey Acquisition-II*, 39 F. Supp. 3d at 904, and Foam Master's effort to add the specific term after these opportunities weighs against reforming the contract.

In the end, Foam Master has not carried its burden. Paratus Supply denies that it ever agreed to replace the hoses. [DE 30, Page ID# 252, 257]. Foam Master's evidence must therefore be "extremely strong." *Johnson*, 834 F. Supp. 3d at 758. It is not. The negotiation record supports competing readings of the parties' final bargain, and nothing in it shows that Paratus Supply shared Foam Master's understanding that hoses remained part of the deal.

### C. Whether Paratus Supply Must Repeat Its Performance

Beyond the hoses, Foam Master asks the Court to order Paratus Supply to repeat its performance under the Settlement Agreement. Specifically, it asks that Paratus Supply:

- pick up the Rig;
- install a new generator;
- perform startup;
- submit warranty forms;
- provide a startup video;
- return the Rig; and
- prove that the generator is new, including by proof of purchase from Winco.

[DE 24, Page ID# 208–09; DE 24-5, Page ID# 232]. Thus, the Court asks whether Foam Master has shown that Paratus Supply failed to perform any obligation the Settlement Agreement imposes. Foam Master has not.

**1. The New Generator**

Paragraph 4 of the Settlement Agreement required Paratus Supply to "install a new 30kW diesel generator." [DE 30-1, Page ID# 267 (¶ 4)]. Foam Master contends the generator Paratus Supply installed was not new because Winco shipped it to Paratus Supply on July 30, 2025, nearly a year before Paratus Supply installed and started it. [DE 24, Page ID# 203]. Paratus Supply responds that a unit held in inventory remains new until it is sold to and used by an end user. [DE 30, Page ID# 262].

The Settlement Agreement does not define "new," and nothing in it ties that word to how long a unit sat in a dealer's inventory. Foam Master offers no evidence that the generator was used, rebuilt, or sold to anyone before Paratus Supply installed it in the Rig. The only evidence on the point is the manufacturer's letter, which states that the unit "is verified as a new unit and is covered by WINCO's standard one (1) year/2,000 hours manufacturer's warranty." [DE 30-2, Page ID# 273]. A shipping date, standing alone, does not show that the generator was anything other than new.

**2. Proof of Purchase**

Foam Master asks the Court to require proof that the generator is new, "including proof of purchase from Winco." [DE 24, Page ID# 209]. The Settlement Agreement contains no such obligation. During negotiations, Paratus Supply offered

"a receipt for the purchase of the brand new 30kW generator." [DE 24-1, Page ID# 215]. That offer does not appear in the May 6 conditions Foam Master accepted [DE 24-1, Page ID# 212-13] or in the Settlement Agreement. Foam Master does not ask the Court to reform the Settlement Agreement to add it. Rather, Foam Master's reformation request is limited to hoses. [DE 24, Page ID# 209]. The Court will not order performance of a term the Settlement Agreement does not contain.

**3. <u>The Manufacturer's Warranty</u>**

Paragraph 4 provides that "[t]he generator shall have a 1-year manufacturer's warranty for which Defendant shall not be responsible for any requirements and/or conditions precedent before said warranty becomes effective." [DE 30-1, Page ID# 267 (¶ 4)]. Foam Master contends the warranty is shortened or invalid. It relies on Winco's written warranty terms, which provide that liquid-cooled units "have 180 days from the WINCO invoice to submit a startup date," and that "[i]f no startup form is submitted, then warranty period starts on the WINCO invoice date unit was sold." [DE 24-3, Page ID# 226].

That provision does not apply. A startup form was submitted. Winco acknowledged it had "received your start up form and filed it away." [DE 24-2, Page ID# 223]. And Winco's Service Manager, whose department has "final authority for all warrant[ies]," confirmed that the generator is covered "through July 5, 2027 or 2,000 hours runtime." [DE 24-3, Page ID# 227]. On this record, Foam Master has not shown that the generator lacks the one-year manufacturer's warranty ¶ 4 requires.

Foam Master questions the signer's authority [DE 24, Page ID# 203-04], but it only offers conjecture in the face of Winco's plain statement. And the Settlement Agreement does not require Paratus Supply to "submit the warranty forms," as Foam Master requests. [DE 24, Page ID# 209]. Paragraph 4 expressly relieves Paratus Supply of responsibility for any conditions precedent to the warranty.

Foam Master has not shown a breach of ¶ 4's warranty term.

#### 4. Repeated Performance

What remains of Foam Master's proposed order would require Paratus Supply to repeat obligations it has already performed:

- Pickup and return. Paratus Supply picked up the Rig on June 22 and returned it on July 7. [DE 24, Page ID# 202; DE 30, Page ID# 244].
- Video. Paratus Supply sent the video on July 8 and again on July 14. [DE 24-2, Page ID# 222, 224]. Foam Master acknowledges that it was sent. [DE 24, Page ID# 203].
- A second generator. This would be warranted only if the first was not new, and Foam Master has not shown that.

Foam Master does not identify any obligation under ¶¶ 3 or 4 of the Settlement Agreement that remains unperformed. Consequently, Foam Master's requests to compel Paratus Supply to repeat performance are denied.

### D. Evidentiary Hearing

Foam Master asks, in the alternative, for "an evidentiary hearing if the Court finds one necessary." [DE 24, Page ID# 209]. The Court does not.

"Ordinarily, an evidentiary hearing is required where facts material to an agreement are disputed." *RE/MAX*, 271 F.3d at 646. "However, no evidentiary hearing is required where an agreement is clear and unambiguous and no issue of fact is present." *Id*. The hearing requirement serves the Court's threshold obligation to "conclude that agreement has been reached on all material terms" before enforcing a settlement. *Id*. at 645-46. Summary enforcement is therefore "appropriate where no substantial dispute exists regarding the entry into and terms of an agreement." *Id*. at 646.

There is no such dispute here. The parties agree that they entered into the Settlement Agreement, and both signed it. [DE 30-1, Page ID# 271]. Its terms are in writing, and, as discussed above, they are unambiguous. Foam Master does not dispute what the Agreement says or argue that it is ambiguous. Rather, Foam Master seeks to add a term the Settlement Agreement does not contain. Nothing about the formation or content of the Agreement requires a hearing.

The Court also does not need an evidentiary hearing to resolve the reformation argument. The Court's conclusion does not depend on resolving any factual dispute against Foam Master. The Court recognizes that the correspondence can be read to include hoses; however, it can equally be read to exclude them. Ultimately, the evidence does not show "beyond a reasonable controversy" that the parties agreed to a hose term and mistakenly left it out. *Abney*, 215 S.W.3d at 704. Foam Master has not identified any witness or testimony it would offer at a hearing to change this calculus. A hearing would not supply what Foam Master's own submission lacks.

The same is true of Foam Master's remaining requests regarding repeated performance. Its contentions about the generator and the warranty rest on documents whose content is undisputed: the packing slip, Winco's warranty terms, and Winco's letter. Foam Master identifies no testimony that would show the generator had been used or that Winco has refused coverage.

**E. PARATUS SUPPLY'S REQUEST FOR DISMISSAL**

In its response, Paratus Supply asks the Court to enforce the Settlement Agreement as written by directing Foam Master to file the agreed order of dismissal with prejudice required by the second paragraph numbered 8. [DE 30, Page ID# 263]. That paragraph requires Foam Master to file the agreed order "[w]ithin seven (7) days of the completion of the repairs and return of the Rig." [DE 30-1, Page ID# 268]. Paratus Supply acknowledges that its request is not presented by motion and offers to file one if the Court prefers. [DE 30, Page ID# 263 n.70]. "A request for a court order must be made by motion." FED. R. CIV. P. 7(b)(1). A request embedded in a response brief does not satisfy that rule, and the Court declines to treat it as a motion.

Nonetheless, neither party disputes that they have executed a valid settlement agreement. Nothing about this Memorandum Opinion and Order alters that fact. If, upon entry of this opinion, no further obligations remain under the Settlement Agreement, the parties should be in a position to conclude this matter as their agreement contemplates. The Court will therefore direct the parties to either file a stipulation of dismissal with prejudice under FED. R. CIV. P. 41(a)(1)(A)(ii) or a joint status report within 14 days.

## III. CONCLUSION

For the foregoing reasons, Foam Master's Motion to Reform and Enforce Settlement Agreement [DE 24], including its alternative request for an evidentiary hearing, is **DENIED**. To the extent Paratus Supply's response [DE 30] requests an order directing Foam Master to file an agreed order of dismissal, the request is **DENIED WITHOUT PREJUDICE** because it was not made by motion.

The Court **ORDERS** that, within fourteen (14) days of entry of this Memorandum Opinion and Order, the parties shall file a stipulation of dismissal with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), or a joint status report identifying why the parties cannot file such a stipulation.

Signed this the 19th of October, 2026.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY